UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| HOWARD N. DENHAM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 07 C 694 |
| | ) | |
| SAKS, INC., a Tennessee corporation, | ) | |
| d/b/a SAKS FIFTH AVENUE, | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION**

CHARLES P. KOCORAS, District Judge:

This matter comes to us on Defendant SCIL, LLC, incorrectly named as Saks,

Inc. ("Saks")'s motion for summary judgment of Plaintiff Howard Denham's three-

count complaint pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the

reasons set forth below, Saks's motion is granted.

## **BACKGROUND**[1]

_____

[1] The following facts have been taken from the parties' Local Rule 56.1
statements and attachments. Saks argues that Denham has impermissibly added a
number of additional facts in his response to Saks's 56.1 statement. While it was
proper for Denham to support his denials with facts outside of Saks's 56.1
statement, it was improper for him to attach additional facts to his admissions to
Saks's 56.1 allegations. _See Ammons v. Aramark Uniform Services_, 368 F.3d 809,
817 (7th Cir. 2004). As a result, the factual recitation that follows will only
consist of properly alleged and supported material facts. _See Brasic v.
Heinemann's Inc._, 121 F.3d 281, 284 (7th Cir. 1997).

## I.    Denham's Employment with Saks

Denham worked at a Saks store located in Skokie, Illinois, as an asset protection investigator from March 10, 2005 until May 13, 2005. Denham's duties as an asset protection investigator included but were not limited to: investigating customers in external investigations, ensuring the physical security of the building, and training associates on avoiding racial profiling.

Saks adopted a policy of "zero tolerance" of racial profiling of its customers and provided its employees with sensitivity training on how to detect suspicious customers. Saks instructed its sales associates to contact an asset protection investigator if they believed that a customer was acting suspiciously. Upon receiving a sales associate's report of a suspicious customer, the asset protection investigator would locate the suspicious customer, observe his behavior, and decide whether the behavior warranted further surveillance. If an asset protection investigator felt that a sales associate was racially profiling Saks's customers, he could confront her or report her to management.

## A.    The Incident

On April 27, 2005, Denham received two separate reports of suspicious behavior from Marlene Cole, a 72-year-old Caucasian sales associate who worked in the fine jewelry department. Each report involved an African-American male.

Denham, a 30-year-old African-American, found both reports to be unwarranted and concluded that Cole had been racial profiling Saks's customers. This made him upset and angry.

Denham subsequently approached Cole and the other jewelry associates on the sales floor. He had his hand in a fist and asked whether African-Americans were allowed to shop at Saks. In response, Cole pointed her finger towards Denham's face and told him that he did not know what he was talking about and that he should not go there. As Denham left to return to the asset protection office he hit his hand against a counter and said, "I'm not going to take this anymore." Cole felt that Denham was so out of control and angry that if the other sales associates had not been present he might have caused her physical harm.

## B. Denham's Claims of Racial Profiling

On April 27, after the Incident, Denham told Elizabeth Wallace, the Human Resources Manager at Saks's Skokie store, "about the issue of how us in asset protection receive numerous calls about black customers that the associates have no reason to call on." Denham also submitted a memorandum to both Wallace and Jim Sloan, the General Manager of the Skokie store, on April 27. In the memo, Denham summarized his version of what happened during the Incident and complained about the sales associates' racial profiling of customers at the store.

This was not Denham's first time reporting sales associates for racial profiling. In his two month career at Saks's Skokie store, Denham made at least ten complaints to his supervisor, Nicole Anderson, about the sales associates' racial profiling of customers and the poor service Saks's African-American customers received.

## II. Saks's Investigation into the Incident

Saks's investigation into the Incident was headed by Sloan, Wallace, and Lisa Tarrant, a Regional Human Resources Director for Saks.

### A. Sloan

Sloan met individually with Denham and five sales associates who had been working adjacent to the jewelry area during the Incident. He also reviewed a typewritten report from Jamie Speciale, an asset protection investigator who had witnessed the Incident.

### B. Wallace

Wallace investigated the Incident from April 27 until May 13. As part of her investigation, Wallace took witness statements and interviewed jewelry sales associates, sales associates who worked adjacent to where the Incident took place on the sales floor, an asset protection investigator, and both Denham and Cole. She took notes of her conversations with these witnesses and later reduced them to typewritten form.

Sloan and Wallace discussed whether to discipline Cole based on the Incident; they decided not to. Sloan felt that it was not inappropriate for Cole to raise her voice in response to Denham because she felt threatened by him. Wallace thought that Cole's conduct was not comparable to Denham's because she believed that Denham had acted in a threatening manner towards Cole and that Cole was merely reacting to Denham's aggressive behavior. Wallace found Denham's threatening behavior to be particularly problematic given his role as someone tasked with protecting the store and its employees.

## C.    Tarrant

On May 3, Wallace sent Tarrant a summary of her conversations with the witnesses as well as their typewritten statements. Tarrant reviewed these materials and found the accounts of the sales associates (Cole, Khamis, Shannon, Buckun, and Oroni) to be more credible than the differing accounts of the asset protection investigators (Speciale and Denham) because Speciale was the sole person supporting Denham's version of events and also because Denham was in jeopardy of disciplinary action. Tarrant also spoke with Wallace and Sloan; Wallace recommended that Denham's employment with Saks be terminated.

### III.    Tarrant Terminates Denham's Employment with Saks

On May 6, Tarrant decided to terminate Denham's employment with Saks because she thought that he had initiated an altercation on the sales floor, that he had acted in a threatening manner towards Cole, and that his threatening behavior had irreparably damaged his relationship with the sales associates who needed to trust him in the store.   She considered discipline less than termination for Denham but concluded that termination was the appropriate step.   Tarrant felt that it was important for sales associates to always feel comfortable speaking with asset protection whenever they were in doubt about a situation and that the sales associates would be reluctant to make necessary reports to Denham for fear of him lashing out against them.

On May 13, Tarrant was informed of his termination in a meeting with Wallace and Bette McNamara, the Regional Director of Asset Protection.

### V.    Tarrant Did Not Investigate Denham or Speciale's April 27 Complaints of Racial Profiling

Both Denham and Speciale made reports of racial profiling on April 27. Though Tarrant was aware of these reports as early as May 3, she did not investigate either of them. Tarrant did not recall being interested in hearing "anything more"

about the racial profiling allegations other than what was reflected in Denham's memorandum and Speciale's statement.

As a preliminary matter we note that after Saks filed its motion for summary judgment, Denham withdrew Count III of his complaint. Consequently, we will consider Saks's motion as it pertains solely to his Title VII claims of race discrimination and retaliation.[2]

## LEGAL STANDARD

### I.     Summary Judgment Standard

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact by specific citation to the record, at which time the burden shifts to the non-moving party

---

[2] Denham's response to Saks's motion for summary judgment indicates that he intended to formally request leave to amend his complaint so as to include a retaliation claim under 42 U.S.C. § 1981. Denham failed to make such a formal request. A court has the discretion to disallow amendments to a complaint brought through arguments presented for the first time in a brief opposing summary judgment. *See Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996). In light of the fact that Denham never filed a formal request for leave to amend his complaint and the fact that his informal request was made for the first time in his brief opposing summary judgment, his request is denied.

to set forth specific facts showing that there is a genuine issue of fact for trial.  Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bedlamer v. Canes Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the nonmoving party as well as view all reasonable inferences in that party's favor. *Anderson*, 477 U.S. at 255.

With these principles in mind, we turn to the instant motion.

## DISCUSSION

### I.  Race Discrimination

Denham asserts that he was terminated on the basis of his race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*  Title VII makes it unlawful for an employer covered under the Civil Rights Act "to discharge any individual...because of such individual's race..." 42 U.S.C. § 2000e-2(a)(1).  A plaintiff claiming discrimination in violation of Title VII can proceed under either the direct method or the indirect method of establishing his claim. *See Sun v. Bd. of Trustees of Univ. of Illinois*, 473 F.3d 799, 812 (7th Cir. 2007).

The direct method requires the plaintiff to produce enough evidence, whether direct or circumstantial, *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994), to create a triable issue of whether the adverse employment action had a discriminatory motivation. *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1294, 1397 (7th Cir. 1997). It is evidence that the decision to terminate was motivated by an illegal animus. *Sun*, 473 F.3d at 812.

Circumstantial evidence may take the form of the following three general types: (1) evidence of suspicious timing, ambiguous statements, or behavior towards other employees; (2) evidence that similarly situated employees were treated differently; or (3) evidence that the employee did not deserve termination and that the employer's reason for termination is a pretext for discrimination. *Nichols v. Southern Illinois University-Edwardsville*, 510 F.3d 772, 782 (7th Cir. 2007).

If a plaintiff has no evidence that the motivation for an employment action was an unlawful one, he or she can still survive summary judgment using the indirect method. *Brewer v. Bd. of Trustees of University of Illinois*, 479 F.3d 908, 915 (7th Cir. 2007). Under the indirect or "burden-shifting" method, a plaintiff such as Denham must first meet the burden of persuasion by establishing a prima facie case of discrimination by showing that: (1) he is a member of a protected class; (2) he was meeting Saks's legitimate expectations of his performance on the job; (3) he suffered

an adverse employment action; and (4) Saks treated a similarly situated employee who was not in the same protected class more favorably than it treated Denham. *See Burks v. Wisconsin Dep't of Transportation*, 464 F.3d 744, 750-51 (7th Cir. 2006).

If Denham is able to advance proof of each element, then Saks must shoulder the burden of production of articulating a legitimate, non-discriminatory reason for taking the actions it took. *See id.* at 751. If Saks does so, Denham must then demonstrate issues of fact exist whether this reason is a pretext designed to cover up discriminatory reasons for the action. *See id.*

Denham attempts to establish a claim of discrimination under both the direct and indirect methods.

## A. The Direct Method

Saks argues that Denham cannot establish a prima facie case of race discrimination under the direct method because he cannot show that Tarrant's decision to terminate him was animated by an illegal employment criterion. Alternatively, Denham contends that Tarrant's decision to terminate him was based only on Wallace's recommendation which in turn was based solely upon information gathered from employees who harbored racial animus.

Despite Denham's arguments to the contrary, this is not a "cat's paw" or "rubber stamp" case where Saks can be held liable for Tarrant's decision. Tarrant

was not simply acting as a conduit for the alleged racially biased views of the sales associates who witnessed the Incident. *See Byrd v. Illinois Dep't of Public Health*, 423 F.3d 696, 710 (7th Cir. 2005). For the cat's paw theory to be applicable, Tarrant's decision would have had to have been *solely* based on her consideration of the alleged biased views of the sales associates. *See Brewer v. Board of Trustees of University of Illinois*, 479 F.3d 908, 918 (7th Cir. 2007). This is not the case.

In addition to considering the alleged biased recollections of the sales associates, Tarrant considered both Denham and Speciale's alleged unbiased accounts of the Incident. Where an employer's decision is "based on nothing more than [two] conflicting stories..., the employer will not be held liable for the racism of the alleged frame-up artist so long as it independently considers both stories." *Id.* Therefore, because Tarrant was "not wholly dependent on a *single source of information*, but instead conduct[ed her] own investigation into the facts relevant to the decision, [Saks] is not liable..." *Id.* (emphasis added). Consequently, Denham has failed to show that a triable issue exists whether he was terminated on account of his race under the direct method.

**B.    The Indirect Method**

*1.    Prima Facie Case*

As stated above, the indirect method requires Denham to establish a prima facie case of discrimination, by a showing that he is a member of a protected class, that he

was meeting Saks's legitimate expectations, that he was subjected to an adverse employment action, and that a similarly situated coworker who was not in the same protected class received more favorable treatment. *See Burks,* 464 F.3d at 750-51.

It is undisputed that Denham is a member of a protected class and that he suffered an adverse employment action when he was terminated. Saks does not assert that Denham was not meeting its legitimate expectations. However, the parties part company on whether Denham has shown that a similarly situated employee who was not African-American was treated more favorably. As discussed below, Denham has not met his burden of establishing this element of his prima facie case.

a. *Similarly Situated Employees*

The inquiry into whether the situation of a potential comparator is similar enough to the plaintiff's to constitute a sufficient prima facie showing is based in common sense rather than rigid formulas. *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007). However, to demonstrate that he was treated less favorably than a similarly situated employee outside his protected class, Denham must identify someone with enough similarity in key areas that a jury could infer that the only meaningful differentiation between the two is Denham's race. *Id.* Normally, a showing that an employee is similarly situated entails proof that "the two employees dealt with the same supervisor, were subject to the same standards, had similar

performance histories, or had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* at 404-05.

Denham identifies Cole as his comparator. Denham complains that Cole was treated more favorably than he because she was not disciplined for her actions on April 27. Though both Cole and Denham share some similarities (they were both subject to Saks's policies and procedures and both took part in the Incident), the areas in which they differ are the most pertinent to Denham's claim of discrimination.

Denham and Cole did not have equivalent positions and the effect of their conduct during the Incident did not impact their ability to perform their job duties in the same way. *See Hoffman-Dombrowski v. Arlington Int'l Racecourse, Inc.*, 254 F.3d 644, 651 (7th Cir. 2001) (finding that two of defendant's employees "were not similarly situated because they did not hold the same or equivalent positions"). Saks chose not terminate Cole because it did not perceive her behavior during the Incident to be inappropriate. Alternatively, Denham was terminated because Saks believed that his conduct during the Incident was both inappropriate and detrimental to his ability to fulfill his duties as an asset protection investigator. These differences concern the very basis for Saks's decision to keep Cole and terminate Denham and demonstrate that Cole is not directly comparable to Denham in all *material* respects.

*See Patterson v. Avery Dennison* Corp, 281 F.3d 676, 680 (7th Cir. 2002). Consequently, we cannot find that Denham and Cole engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish Saks's treatment of them. *See Humphries*, 474 F.4d at 404-405. As a result, Denham's claim of race discrimination does not survive summary judgment.

## II.     Retaliation

Saks also requests summary judgment of Denham's retaliation claim, which is based on his assertion that he was terminated in retaliation for his complaints to management that Saks's sales associates engaged in racial profiling of Saks's African-American customers and provided them with poor service.

As is the case for claims of unlawful discrimination, claims of unlawful retaliation can be established using a direct or an indirect method. *See Roney v. Illinois Dep't of Transp.*, 474 F.3d 455, 459 (7th Cir. 2007). A plaintiff proceeding under the direct method must set forth actual evidence that he was subject to an adverse action as a result of engaging in a protected activity under Title VII without inference or presumption. *See id; see also Davis v. Con-Way Transp. Cent. Express, Inc.*, 468 F.3d 776, 783 (7th Cir. 2004). This means that to establish his claim, Denham must show: "(1) [he] engaged in statutorily protected activity; (2) [he] suffered an adverse employment action taken by [his] employer; and (3) a causal

connection between the two." *Moser v. Ind. Dep't of Corrs.*, 406 F.3d 895, 903 (7th Cir. 2005).

Under the indirect method, in order to establish a prima facie case of retaliation, Denham must show: (1) membership in a protected class; (2) that he was performing his job in a satisfactory manner; (3) that he was subjected to an adverse employment action; and (4) that similarly situated employees who did not engage in the statutorily protected activity were treated more favorably. *See Hill-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002). If Saks can offer a legitimate non-individuous reason for terminating Denham, then Denham must rebut the reason with evidence of pretext. *See Rhodes v. Illinois Dep't. of Transp.*, 359 F.3d 498, 508 (7th Cir. 2004).

Denham attempts to prove retaliation under both the direct method and the indirect method, however, Saks attacks his ability to proceed under both stating that Denham's Title VII claim fails because his complaints were not about an *unlawful employment practice* but instead about Saks's practices towards its *customers*.

The retaliation clause of section 2000e-3(a) provides in part as follows:

> It shall be an unlawful employment practice for an *employer* to discriminate against any of his *employees*...because he has opposed any practice made an unlawful employment practice by this subchapter...(emphasis added).

- 15 -

Section 2000e-2(a)(1) provides the practices made unlawful by Title VII:

It shall be an unlawful employment practice for an employer...to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

To be afforded the protections of section 2000e-3(a), Denham does not need to show that he was complaining about conduct that violated Title VII in fact. *Talanda v. KFC Nat. Management Co.*, 140 F.3d 1090, 1096 (7th Cir. 1998). Rather, he need only establish that he had a subjectively sincere and *objectively reasonable* belief that he was challenging conduct protected under Title VII. *See Talanda*, 140 F.3d at 1096.

The issue here is whether it was objectively reasonable for Denham to believe that his complaints about the way Saks's sales associates treated Saks's customers concerned activity protected under Title VII. The parties have not brought any Seventh Circuit case law to our attention, nor have we found any, that addresses the specific issue in this case. However, Saks provided us with a Second Circuit case, *Wimmer v. Suffolk County Police Department*, 176 F.3d 125, 136 (2d Cir. 1999), which we find relevant to the instant matter. The Second Circuit in *Wimmer* denied the plaintiff's Title VII claim of retaliation after concluding that it was not objectively reasonable for the plaintiff to believe that opposing discrimination by co-employees

with respect to the general public concerns an *employment* practice. *Id.* We find such

reasoning to be persuasive in the instance case because Denham's complaints

concerned his opposition to his co-employees' discrimination of Saks's customers

and Title VII is directed "against discrimination in the conditions of *employment*."

*Carr v. Allison Gas Turbine Div.*, 32 F.3d 1007, 1009 (7th Cir. 1994) (emphasis

added).

It is clear that Title VII focuses on how an employer treats his *employees*, not

on how an employer treats his *customers*. Thus, like the plaintiff's belief in *Wimmer*,

it was not objectively reasonable for Denham to believe his complaints concerned

activity protected under Title VII because his complaints focused on Saks's sales

associates' unequal treatment of Saks's African-American *customers*, not on Saks's

unequal treatment of its *employees*. *See Id.*

Denham argues that his complaints concerned more than just how Saks's

African-American customers were being treated; he argues that his complaints

concerned his discomfort with having to conduct unwarranted surveillance on Saks's

African-American customers. As Saks notes, there is no evidence in the record that

indicates that Denham was *required* to conduct unwarranted surveillance of Saks's

African-American customers. Rather, the record evidence demonstrates, and Denham

admits, that he never made complaints that he was discriminated against by Saks.

Moreover, assuming *arguendo* that Saks had required Denham to conduct racial profiling of its African-American customers, it would still have been unreasonable for Denham to believe that his complaints about such activity concerned conduct protected under Title VII. This is because Denham's complaints were not that the sales associate's alleged discriminatory behavior affected him in a different way than it affected other asset protection investigators of other races. *See Gleason v. Meisrow Financial, Inc.*, 118 F.3d 1134, 1142 (7th Cir. 1997) (finding that employee did not have a reasonable objective belief that her complaints of alleged gender discrimination constituted activity protected under Title VII because such discrimination affected both male and female employees equally). Rather, Denham complained about how the sales associates' behavior affected *all* of the asset protection investigators ("all of us in asset protection"). Therefore, because Denham's complaints focused on the unequal treatment of Saks's African-American *customers* and not the unequal treatment of Saks's *employees*, it was not objectively reasonable for Denham to believe that he was complaining about activity protected under Title VII.

Consequently, Denham's claim of retaliation does not survive summary judgment.

# **CONCLUSION**

For the foregoing reasons, Saks's motion is granted.

_____
Charles P. Kocoras
United States District Judge

Dated:   July 30, 2008